---

**SO ORDERED,**



*Selene D. Maddox*

**Judge Selene D. Maddox**

**United States Bankruptcy Judge**

The Order of the Court is set forth below. The case docket reflects the date entered.

---

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF MISSISSIPPI

**IN RE: FEILITECH US LLC**                    **CASE NO.: 23-10599-SDM**

**DEBTOR**                                      **CHAPTER 11**

### MEMORANDUM OPINION AND ORDER APPROVING IN PART AND DISAPPROVING IN PART INTERIM FEE APPLICATIONS

Before the Court are two interim applications for compensation: (1) the *First Interim Application for Compensation and Reimbursement of Expenses for the Period of February 28, 2023, through May 31, 2023, by the Law Firm of Jones Walker LLP as Counsel to Debtor* (Dkt. #129) filed by Jones Walker LLP ("Jones Walker"); and (2) the *First Interim Application for Compensation and Reimbursement of Expenses for the Period of February 28, 2023 through May 31, 2023, by the Law Firm of Cozen O'Connor as Counsel to the Debtor* (Dkt. #133) filed by Cozen O'Connor ("Cozen") (collectively, "the Interim Fee Applications"). The United States Trustee (the "UST") filed two Responses: (1) the *UST Response to First Interim Application for Compensation for Jones Walker LLP [Dkt. 129]* (Dkt. #147) and (2) the *UST Response to First Interim Application for Compensation for Cozen O'Connor [Dkt. 133]* (Dkt. #147) (collectively, the "UST Responses").

The Court conducted a hearing on the Interim Fee Applications on June 20, 2023 (the "Initial Hearing"), during which Kristina Johnson ("Johnson") on behalf of Jones Walker, Allen Guon ("Guon") on behalf of Cozen (collectively, the "Applicants"), the subchapter V Trustee, Craig Geno ("Geno"), and the UST all presented arguments. Further, Johnson testified and presented documentary evidence in support of the Interim Fee Applications. At the conclusion of the hearing, the Court required the parties to present additional proof to support their respective positions on the legal issues. Specifically, the Court directed the parties to submit additional proof concerning the current market hourly rates of attorneys' fees for bankruptcy practitioners in the Northern and Southern Districts of Mississippi.

The Court also allowed the parties to submit additional authority and argument by July 20, 2023 concerning the UST's guidelines for review of compensation applications.[1] At the request of the parties, the Court scheduled an additional hearing (the "Second Hearing") so that the Applicants could submit the proof concerning hourly rates and rate structures that were proprietary in nature. Following the hearing on August 1, 2023, the Court took the Interim Fee Applications under advisement. The Court is now prepared to rule.

## I. JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Chief District Judge L.T. Senter and dated August 6, 1984. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate).

---

[1] *Appendix B Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under United States Code by Attorneys in Larger Chapter 11 Cases*, 78 Fed. Reg. 36248 (June 17, 2013) (the "Appendix B Guidelines").

## II. BACKGROUND

Feilitech, US LLC ("Feilitech") initiated its voluntary Chapter 11, subchapter V

bankruptcy on February 28, 2023 (the "Petition Date"). Feilitech, which is based in Belden,

Mississippi, imports, sells, and assembles components for upholstery manufacturers. *Declaration*

*of Darla Grisham in Support of the Debtor's Chapter 11 Petition and First Day Relief* (the "First

Day Declaration") (Dkt. #8). Feilitech's customers deliver unassembled furniture to its facility,

where Feilitech then assembles its and/or the customers' components into completely assembled

sleeper mechanisms. *Id.* A few examples include sleeper mechanisms for pull-out sleeper sofas,

coils for chairs, and other similar furniture components. *Id.* Feilitech was founded by Damon

Fisher ("Fisher") and Weijie Gu ("Gu"), the latter of whom lives in Haining City, China and is a

manager of Zhejiang Feili Technology Co., Ltd. After Fisher's employment ended on or about

October 5, 2022, Gu became Feilitech's sole member. On or about October 10, 2022, Feilitech

brought on Darla Grisham ("Grisham") to manage the company.[2] As of Petition Date, Feilitech

had 13 full-time employees.

On the Petition Date, Feilitech filed several emergency motions[3], including two

employment applications: (1) the *Application for the Employment and Retention of Jones Walker*

---

[2] Grisham stated in the First Day Declaration that prior to the Petition Date, The United States Customs Border Protection issued $387,239.65 in bills for allegedly misclassifying imported goods which led to underpayment of customs duties. She further stated that based on her review of Feilitech's records, Fisher had made over $1.1 million in unexplained transfers from Feilitech's operating account to his personal accounts.

[3] *Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses, and (B) continue Employee Benefit Programs and (II) Granting Related Relief* (Dkt. #6) and the *Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Continued Use of Existing Bank Account, and Waiving Certain Investment and Deposit Guidelines, (II) Authorizing the Continued Use of Existing Business Forms, and (III) Granting Related Relief* (Dkt. #7). Both emergency motions were later granted by the Court. Dkt. #s 32, 41, and 80.

*LLP as Counsel for the Debtor Effective as of the Petition Date* (Dkt. #11) (the "Jones Walker Employment Application") and (2) the *Application for the Employment and Retention of Cozen O'Connor as Counsel for the Debtor Effective as of the Petition Date* (Dkt. #12) (the "Cozen Employment Application") (collectively, the "Employment Applications").[4] Both Employment Applications sought authorization to employ the Applicants as Feilitech's bankruptcy counsel under 11 U.S.C. §§ 327(a) and 328(a), and Federal Rules of Bankruptcy Procedure, Rule 2014(a).[5] Evident from the Employment Applications, Cozen would serve as Feilitech's primary bankruptcy counsel and, due to Cozen's status as an out-of-district law firm, Jones Walker's attorney, Johnson, would serve as local bankruptcy counsel.

According to the Employment Applications, the Applicants requested employment based on the Applicants' "normal" hourly rates and reimbursement policies in effect at the time the Applicants rendered service. In addition, both Employment Applications indicated that the proposed compensation was reached by an agreement of the parties, i.e., an agreement between Feilitech and Cozen and Jones Walker. Cozen's Employment Application specified that its attorneys would charge their 2022 hourly rates for work performed through the end of 2023, with specific hourly rates as follows: Robert M. Fishman at $940.00 per hour; Guon at $640.00 per hour; a range of $360.00 to $505.00 per hour for associates working on the matter; and $300.00 per hour for paraprofessionals. Likewise, Jones Walker's Employment Application indicated that Feilitech agreed to compensate Jones Walker at its customary hourly rates, with specific 2022

---

[4] Johnson and Guon attached declarations as exhibits to the Interim Employment Applications (collectively the "Employment Application Declarations"). Dkt. #11, Ex. A, Dkt. #12, Ex. A.
[5] All statutory references will be to Title 11 of the United States Code unless indicated otherwise. Any references to the Federal Rules of Bankruptcy Procedure will be referred to simply as "Bankruptcy Rule ___."

hourly rates as follows: Johnson at $650.00 per hour; a range of $375.00 to $535.00 per hour for other professionals working on this matter; and $270.00 per hour for paraprofessionals.[6]

No party, including the UST, objected to the Employment Applications, and after review, the Court approved the Employment Applications on March 29, 2023.[7] Notably, both Employment Orders approved the Employment Applications under §§ 327(a) and 328(a) and Bankruptcy Rule 2014(a): "Pursuant to 11 U.S.C. §§ 327(a) and 328(a) and Fed. R. Bankr. P. 2014(a), the Debtor is authorized to employ Jones Walker as its bankruptcy counsel in connection with the Debtor's Chapter 11 case, effective as of the Petition Date, to render the services set forth in the Application." *Id.* The Court's Employment Order pertaining to Cozen contained the same language. Regarding compensation, the Employment Orders contained the following:

[. . .]

4. The compensation and expense reimbursement provisions set forth in the [Employment Applications] are approved subject to the limitations of Miss. Bankr. L.R. 2014-1(2) and a separate request for approval of compensation mandated therein.

5. Any application for compensation and reimbursement of expenses shall set forth the date of entry of all previous orders allowing compensation and reimbursement of expenses and the amounts so allowed.

6. This Court shall retain jurisdiction to implement, enforce, and interpret this Order.

*Id.*

---

[6] Both Employment Applications noted that Cozen and Jones Walker expected their hourly rates would be adjusted on or about January 1, 2024.

[7] *Order Granting Debtor's Applications for Employment and Retention of Jones Walker LLP as Counsel Effective as of the Petition Date [Dkt. #11]* (Dkt. #66) and *Order Granting Debtor's Application for the Employment and Retention of Cozen O'Connor as Counsel for the Debtor Effective as of the Petition Date [Dkt. #12]* (Dkt. #67) (the "Employment Orders").

*The Interim Fee Applications and UST Responses*

Several months after the Court approved the Employment Applications, the Applicants filed their Interim Fee Applications, seeking fees and expenses from February 28, 2023 to May 31, 2023. Cozen requested a total of $113,172.23, representing $109,437.50 in fees and $3,734.73 in expenses. Cozen's request for fees covered approximately 204.30 total hours of work.[8] Jones Walker requested a total of $33,012.14, which represents $30,825.00 in fees and $2,187.14 in expenses. Jones Walker's request for fees covered approximately 67.30 total hours of work.[9] In their Interim Fee Applications, both Applicants requested compensation under §§ 327 and 330 and Bankruptcy Rule 2016. In addition, both Applicants submitted in their Interim Fee Applications that the services rendered on Feilitech's behalf were of substantial benefit to the bankruptcy estate in satisfaction of the § 330 "criteria" and the *Johnson*[10] factors. The Interim Fee Applications, however, made no reference to the Applicants' allegedly preapproved hourly rates under § 328(a).

On May 16, 2023, the UST filed the UST Responses, mainly objecting to the proposed hourly rate of $650.00. Specifically, the UST argues that the hourly rates "exceed the average hourly rate of Mississippi bankruptcy attorneys," maintaining that the hourly rates in this bankruptcy case should be analyzed in accordance with *In re Sanderson Plumbing Products, Inc*, *Order on Lowenstein's Final Fee Application*, Case No. 13-14506-JDW, Dkt. #597 (Bankr. N.D.

---

[8] Cozen's hourly rates charged and time expended is as follows: Robert M. Fishman, $940.00 per hour for 1.40 hours; Allen J. Guon, $640.00 per hour for 131.70 hours (in addition to $320.00 per hour for 23.20 hours travel time billed at a half rate); Arielle Eisenberg, $475.00 per hour for 3.40 hours; Christina A. Sanfelippo, $505.00 per hour 6.90 hours; and Patricia M. Fredericks, $300.00 per hour for 37.70 hours (paraprofessional fees).

[9] Jones Walker's hourly rates charged and time expended is as follows: Kristina M. Johnson $650.00 per hour for 33.30 hours and Kilby M. Brabston, $270.00 per hour for 34.00 hours (paraprofessional fees).

[10] *Johnson v. Ga. Highway Express*, 488 F.2d 714 (5th Cir. 1974) (establishing additional factors used to determine the reasonableness of attorney's fees.)

Miss. December 16, 2015)[11], where the court determined the appropriate hourly rate in that bankruptcy case to be up to $425.00 per hour for counsel on behalf of the creditors committee and declined to adjust the hourly rate upward under the § 330 and *Johnson* factors. With respect to Jones Walker, the UST claims that certain fees are duplicative in nature: Jones Walker attended two hearings on March 1, 2023 and April 18, 2023 in which Cozen was also present. The UST asserts such duplication of services was unnecessary and of no benefit to the bankruptcy estate under § 330. The UST made additional objections to the Cozen Interim Fee Application, including: (1) the same duplication argument above; (2) that Cozen sought reimbursement for services of 9.6 hours devoted to the filing of a disclosure statement and plan when a disclosure statement and plan had not been filed in the bankruptcy case; and (3) that Cozen failed to disclose (or at least provide sufficient information regarding) the $170,770.50 prepetition retainer in its Interim Fee Application.[12]

*The Initial Hearing: June 20, 2023*

At the initial hearing on June 20, 2023, the parties argued over the alleged duplication of services, the request for reimbursement for services related to filing a disclosure statement and plan, the Cozen retainer, and, most importantly, the requested hourly rates and whether those hourly rates are permissible under the rationale in *Sanderson Plumbing*. Johnson argued that the Interim Fee Applications are consistent with the Employment Applications, neither of which elicited objections prior to approval. As to both Johnson and Guon's attendance at the hearings referenced above, Johnson asserted that attorneys were required to be present to comply with Uniform Local Rule of the United States Bankruptcy Courts for the Northern and Southern

---

[11] The Court will discuss *Sanderson Plumbing* in more detail below.

[12] The Court notes that Jones Walker also received a $20,000.00 prepetition retainer from Feilitech. The UST made no mention of Jones Walker's prepetition retainer.

Districts of Mississippi, Rule 9010-1 and Rule 83.1(d)(3) of the Local Uniform Civil Rules of the

United States District Courts for the Northern District and the Southern District of Mississippi,[13]

which requires counsel admitted pro hac vice to associate with local counsel and creates

independent obligations that must be carried out by each law firm.[14] She further argued that the

effect of the UST's Objection would preclude debtors from hiring out of state counsel.

Johnson cited to multiple bankruptcy cases in Mississippi in which similar hourly rates

were approved.[15] Johnson's final argument relied on the Appendix B Guidelines. Specifically, she

argued that the UST should not object to hourly rates that are higher than local rates (here, Cozen's

hourly rates) if the requested rates are consistent with reasonable rates in the location of the law

firm's primary office. In addition, concerning Jones Walker's rate structure, Johnson argued that

if she is forced to charge a lower hourly rate in Mississippi, her hourly rates in other jurisdictions,

e.g., in Texas, would have to be reduced.

Johnson then testified regarding the UST's objection to the Applicants' hourly rates. She

conceded that while the Local Bankruptcy Rules require separate approval of compensation, the

---

[13] Any subsequent references to the Uniform Local Rules of the United States Bankruptcy
Courts for the Northern and Southern Districts of Mississippi will be referred to as "Local
Bankruptcy Rule ___." References to the Local Uniform Civil Rules of the United States District
Courts for the Northern District and the Southern District of Mississippi will be referred to as
"Local Civil Rule ___."

[14] The Court entered in evidence copies of both the Local Bankruptcy Rules and the Local
Civil Rules. Ex. 1.

[15] Johnson mentioned *In re Opus Mngmt, LLC.,* Case No. 16-00297-NPO, *Seventh Interim
and Final Application of Butler Snow LLP for Allowance of Administrative Claim for
Compensation and Reimbursement of Necessary Expenses*, Dkt. #1046 (Bankr. S.D. Miss. Dec.
20, 2021) and *In re Tenrgys, LLC*, Case No. 21-01515-JAW, *Order Approving First and Final Fee
Application of Weil, Gotshal & Manges LLP, Attorneys for Debtors, for Final Allowance of
Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary
Expenses Incurred from September 17, 2021 through and including March 18, 2022 (Dkt. #494)*,
Dkt. #514 (Bankr. S.D. Miss. May 10, 2022) as examples of Chapter 11 bankruptcy cases in
Mississippi where those courts approved similar hourly rates for attorneys.

scope of approval differs depending on whether the Court approved an hourly rate or contingency fee at the outset of employment. She then testified that the hourly rate charged by Jones Walker was justified, as Jones Walker is ranked first in the bankruptcy field in Mississippi, has multiple attorneys in the American College of Bankruptcy, and has multiple attorneys that are board certified in business bankruptcy law by the American Board of Certification. Johnson further justified Jones Walker's rate structure and testified that her hourly rate for 2023 is $700.00, $50.00 higher than the hourly rate charged in this bankruptcy case so far.

Guon's arguments regarding both law firms' presence at the previous hearings mirrored those made by Johnson and highlighted that, in addition to the requirements under the Local Bankruptcy Rule and the Local Civil Rule, both he and Johnson contributed at each hearing. Regarding the Applicants' hourly rates, Guon asserted that the UST failed to object to the legitimacy of the hourly rates charged. According to Guon, Cozen is a national firm with approximately 825 attorneys, 31 offices, and includes, in addition to both Fishman and himself, multiple members of nationally recognized bankruptcy organizations. Guon also argued that Cozen's hourly rates are reasonable considering that prior to filing and at the time of submitting its Employment Application, Feilitech was generating approximately $10 million in annual revenue, and the bankruptcy case was, and still is, a complex case. Guon further argued that the 9.6 hours claimed in connection with filing a plan consisted of steps taken to address issues encountered while preparing the plan, as evidenced in Cozen's Interim Fee Application. Guon addressed the disclosure of Cozen's prepetition retainer and acknowledged that the amount

remaining at the Petition Date, approximately $46,000.00, was fully disclosed in Cozen's Employment Application.[16]

The hearing concluded with arguments from the UST and Geno. The UST argued that it was in the interest of justice to require showing of why rates above those of similar attorneys in the district should be approved. The UST asserted that the bankruptcy case itself was not complex, and that the Court should follow the analysis set out in *Sanderson Plumbing* under § 330 and reduce the Applicants' hourly rates. Finally, the UST argued that it was not the UST's intent to place a "cap" on attorneys' fees in the district. Instead, the UST alleges it uses *Sanderson Plumbing* as a guide to determine whether other applicant's hourly rates are justified. The UST urged the Court to require a showing of why the Applicants here are entitled to an hourly rate above that determined to be reasonable in *Sanderson Plumbing* because the hourly rates allowed would impact the bankruptcy estate and Creditors.

Geno agreed with the Applicants and stated that clients, including debtors, should be able to choose their own counsel. He further stated that it was his understanding that Feilitech had a relationship with Cozen and was likely willing to accept Cozen's hourly rates based on prior knowledge of their work. Geno then differentiated *Sanderson Plumbing* from the current case by pointing out that the fees in *Sanderson Plumbing* were for counsel for the unsecured creditors' committee as opposed to the debtor's counsel.

*Supplemental Proof, Briefing, and the Second Hearing*

The Applicants and the UST submitted additional proof and briefing concerning the average hourly market rates of attorneys' fees in Mississippi and the Appendix B Guidelines on

---

[16] On March 14, 2023, Cozen also filed its *Disclosure of Compensation* (the "Disclosure") (Dkt. #57), indicating that Feilitech paid $170,770.50 as a prepetition retainer.

July 20, 2023. In addition, both parties submitted replies on July 31, 2023. After receiving the

briefs, replies, and additional proof, the Court conducted the Second Hearing on August 1, 2023.

During the Second Hearing, both parties made arguments, the substance of which mirrored those

made at the Initial Hearing. In addition to mirroring their prior arguments, the Applicants also

argued that the Court previously approved their hourly rates under § 328.

The Court will summarize the arguments relating to the Applicants' fees, whether made in

the parties' pleadings or during the hearing on August 1, 2023. The Applicants argue that the

UST's challenge to their approved rates is improper under § 328. They assert that because the

Court approved their employment under §§ 327 and 328, the Applicants received prior approval

of their hourly rates, which limits the Court's ability to alter their compensation. Relying on *Peele*

*v. Cunningham (In re Texas Sec., Inc.),* 218 F.3d 443, 445 (5th Cir. 2000), the Applicants argue

there is a stringent standard for modification even if the proposed hourly rate differs from the

prevailing hourly rate. To support this argument, the Applicants cite the "improvident" standard:

that courts must find that the original arrangement was improvident due to unanticipated

circumstances before a court can reduce fees approved under § 328. In addition to arguing that

their hourly rates had been preapproved, the Applicants submitted multiple exhibits[17] to support

their alternative argument that the hourly rate established in *Sanderson Plumbing* is not the same

as the current market hourly rate for practitioners in Mississippi.

The Applicants submitted the declaration of Antonella Montagna (the "Montagna

Declaration"), the Director of Pricing and Legal Project Management for Jones Walker. The

Montagna Declaration outlines the 2023 standard hourly rates for Jones Walker, which range from

---

[17] For ease of reference, the exhibits submitted at the Second Hearing are numbered
consecutively with those from the Initial Hearing.

$615.00 to $890.00 for partners and $470.00 to $525.00 for associates. Ex. 3. The Montagna Declaration further provides that according to five inflation indexes "used by courts around the country", the standard rate in 2015 (when *Sanderson Plumbing* was decided) would be between $567.00 and $604.00 today, depending on which index is used for adjustment. Ex. 3(A). The fourth exhibit consists of declarations (the "Attorney Declarations") concerning the standard hourly rates from several well qualified bankruptcy practitioners who practice in the state of Mississippi. For illustrative purposes, the hourly rates included in the Attorney Declarations are shown in the table below:

| Partners | Associates |
|---|---|
| $615.00 | N/A |
| $575.00 | N/A |
| $440.00 - $610.00 | $320.00 - $405.00 |
| $450.00 - $500.00[18] | $275.00 |
| $450.00 | $400.00 |
| $460.00 | N/A |
| $470.00 - $570.00 | $250.00 - $440.00 |
| $630.00 | N/A |
| $500.00 - $875.00 | $325.00 - $500.00 |

---

[18] These figures included in one of the attorney declarations contained a caveat: the hourly rates reflected the lower overhead associated with a solo practitioner. The Court notes that from a practical standpoint, larger law firms carry increased overhead and/or operational expenses which could result in their attorneys charging higher hourly rates.

Ex. 4. The last exhibit, a declaration from Guon (the "Guon Fee Declaration"), provided that the standard hourly rates for Cozen in 2023 range from $580.00 to $995.00 for partners and $350.00 to $560.00 for associates. The Guon Declaration further acknowledged Cozen is charging Feilitech its 2022 hourly rates and not its 2023 hourly rates. According to Guon, Cozen's 2022 hourly rates at the date of filing the Interim Fee Application has saved the bankruptcy estate approximately $9,107.50. Ex. 5.

Conversely, the UST argues that under the congressional scheme for retaining and compensating attorneys found in §§ 327 through 330, the Court has authority to award compensation of a lesser amount than requested to attorneys employed under § 327. Further, the UST avers that the hourly rates requested by the Applicants should be analyzed in accordance with *Sanderson Plumbing* and the § 330 and *Johnson* factors, which would result in a reduction of the Applicants' hourly rates because this bankruptcy case is not sufficiently of a complex nature to justify higher nonlocal rates. To demonstrate what the UST described as the prevailing market rate in the community, it submitted approximately 730 pages of pleadings from open Chapter 11 bankruptcy cases in Mississippi. *Memorandum Brief in Support of his Response to Application for Compensation and Reimbursement of Expenses filed by Jones Walker P.A. and Cozen O'Connor [DKTS. 129 and 133],* Ex. A, Dkt. #170.[19]

### III. DISCUSSION

The Court is tasked with deciding several issues. The Court must first determine whether it approved the Applicants' hourly rates under § 328 at the time it approved the Applicants'

---

[19] The UST's exhibit consisted of invoices, applications, and orders from 34 current Chapter 11 cases in the Northern District of Mississippi in which the hourly rates ranged from $250.00 to $450.00 for debtors' attorneys, excluding Johnson's rate of $650.00 in the current bankruptcy case.

employment. If so, the Court must determine whether it should reduce the Applicants' hourly rates

or overall compensation. Regardless of the answers to the above questions, the Court is prepared

to address whether the UST is misusing the *Sanderson Plumbing* decision to effectively create an

artificial cap[20] on attorneys' compensation that is not supported by the Bankruptcy Code or the

Bankruptcy Rules. In doing so, the Court will further explore *Sanderson Plumbing* and § 330's

applicability to this bankruptcy case.[21]

## A.  Compensation under § 328

Professionals in bankruptcy have the option to be compensated under either §§ 328(a) or

330(a). *In re Davidson*, 596 B.R. 841, 849 (Bankr. N.D. Miss. 2019) (citing *In re Barron*, 325 F.3d

690, 693 (5th Cir. 2003) (hereinafter, "*Barron II*")). Section 328(a) provides that:

> The trustee, or a committee appointed under section 1102 of this title, with the
> court's approval, may employ or authorize the employment of a professional person
> under section 327 or 1103 of this title, as the case may be, on any reasonable terms
> and conditions of employment, including on a retainer, *on an hourly basis*, on a
> fixed or percentage fee basis, or on a contingent fee basis. Notwithstanding such
> terms and conditions, the court may allow compensation different from the
> compensation provided under such terms and conditions after the conclusion of
> such employment, if such terms and conditions prove to have been improvident in
> light of developments not capable of being anticipated at the time of the fixing of
> such terms and conditions.

11 U.S.C. § 328(a) (emphasis added). Section 328(a) applies when the court approves a fee as part

of the employment application at the outset of the engagement, while § 330(a) applies when the

court has yet to do so. *In re ASARCO, L.L.C.*, 702 F.3d 250, 260 (5th Cir. 2012) (citing *In re Texas

Sec., Inc.,* 218 F.3d 443, 445 (5th Cir. 2000)).

---

[20] Black's Law Dictionary defines a cap as: "[a]n upper limit, such as a statutory limit on
the recovery in a tort action or on the interest a bank can charge." *Cap,* BLACK'S LAW DICTIONARY
(11th ed. 2019).

[21] In addition to the above, the Court will also briefly address two issues: (1) the status,
including disclosure, of the prepetition retainers paid by Feilitech to the Applicants and (2) the
applicability of the UST's Appendix B Guidelines.

The Court of Appeals for the Fifth Circuit has interpreted § 328 to be a limiting section on the power of the bankruptcy court to alter the compensation of professionals if previously approved. *In re Texas Sec., Inc.*, 218 F.3d at 445-46 (citing *In the Matter of National Gypsum Co. v. Donaldson Lufkin & Jenrette Securities Corp.*, 123 F.3d 861, 862-63 (5th Cir. 1997)); *In re ASARCO*, 702 F.3d at 257 ("[w]e have repeatedly interpreted § 328 as meaning precisely what it says [. . .] once those terms have been approved pursuant to § 328(a), the court may not stray from them at the end of the engagement unless developments subsequent to the original approval that were incapable of being anticipated render the terms improvident."); *In re Coho Energy, Inc.*, 395 F.3d 198, 204 (5th Cir. 2004); *Barron II*, 325 F.3d at 693. Put plainly, if a court has given prior approval to the terms of compensation, the court may not then award a "reasonable" fee under § 330 unless the court has determined the initial agreement was improvident.

Section 328, therefore, creates a "high hurdle" to overcome for a movant—or a bankruptcy court—seeking to revise terms governing a professional's compensation ex post facto. *ASARCO*, 702 F.3d at 258. The standard to allow different compensation from that preapproved under § 328 is not that subsequent events were unforeseeable or unanticipated; rather, the standard is that the movant or the court must state with specificity that subsequent events were "incapable of being foreseen" or "incapable of being anticipated" at the time of the preapproval. *Id*. at 258 (citing *In re Smart World Techs., LLC*, 552 F.3d 228, 235 (2d Cir. 2009) (internal quotations omitted)). The party seeking to revise the terms governing a professional's compensation under § 328 has the burden of proof. *In re LATAM Airlines Grp. S.A.*, 643 B.R. 773, 784 (Bankr. S.D.N.Y. 2022).

*1. Preapproval of the Applicants hourly rates under § 328*

As explained above, the Fifth Circuit has made clear the standard for altering a preapproved hourly rate or contingency fee under § 328 at the compensation stage. What the Fifth Circuit has

not made clear is how a court determines whether an applicant's hourly rate or contingency fee has been preapproved under § 328. In fact, the Fifth Circuit has not specifically addressed this question, and instead has focused on the after-effect of such approval under § 328. The Court does note one case in which the Fifth Circuit reversed a bankruptcy court on appeal and found preapproval of a fixed monthly fee under § 328 in *National Gypsum*.

In that case, the Chapter 11 debtor-in-possession agreed to pay its law firm, DLJ, $125,000.00 per month. *National Gypsum*, 123 F.3d at 862. The bankruptcy court approved this retention agreement with the provision in its order that the bankruptcy court retained the right to assess and approve the reasonableness and amount of DLJ's fees both on an interim and final basis. *Id*. Over the course of 23 months, the bankruptcy court issued three orders for interim compensation based on the terms of the initial retention agreement. *Id*. Nevertheless, at the time of the final fee application, the bankruptcy court reduced the allowed fee after considering the reasonableness of compensation in comparison to similar cases in the same district under § 330. *Id*. Aggrieved, DLJ appealed, and the district court affirmed the bankruptcy court and found § 328 inapplicable because the bankruptcy court's employment order was contingent on final approval concerning reasonableness. *Id*.

The Fifth Circuit reversed and remanded, holding that the bankruptcy court "expressly approved the terms of the [retention] agreement" after the court's approval "upon the terms and conditions" of an engagement letter executed between the parties. *Id.* at 862-63 (internal quotations omitted). Underlying its holding, the Fifth Circuit concluded this language was not a retention by the bankruptcy court to consider and approve reasonableness of the monthly fee under § 330 later. *Id.* at 863. Instead, the Fifth Circuit found this language "merely recited [the bankruptcy court's]

control of the compensation in the event of subsequent and unanticipated circumstances affecting the reasonableness of that agreed fee." *Id.*

While *National Gypsum* is instructive in so far as illustrating circumstances where preapproval of compensation triggers § 328 and its heightened standard (and the Court finds it instructive for application to the preapproval issue before it), the Fifth Circuit did not clearly articulate what "approval" means in the context of § 328. As such, and like courts in other circuits, this Court must adopt a standard to determine whether it did approve the Applicants' hourly rates under § 328 in this bankruptcy case.[22] Other circuit courts of appeal have adopted competing tests governing preapproval, which has resulted in a split of authority. The Court begins with two arguably stricter approaches adopted by the Third and Ninth Circuits.

In *Zolfo, Cooper & Co. v. Sunbeam-Oster Co,* the bankruptcy court authorized Zolfo, Cooper & Company's ("Zolfo Cooper") employment as the debtor's accountants. *Zolfo, Cooper & Co. v. Sunbeam-Oster Co.*, 50 F.3d 253, 255 (3d Cir. 1995). Along with its employment application, Zolfo Cooper filed an affidavit containing its hourly rates, attached the retention letter from the debtor, and submitted evidence that the debtor had previously paid the rate. *Id.* at 260. In addition, the bankruptcy court's employment order stated that the debtors were authorized to retain Zolfo Cooper to perform the services as provided in the motion and affidavit. *Id.* at 262. Despite the bankruptcy court's employment order, the bankruptcy court later capped Zolfo Cooper's fees at a lower hourly rate than approved initially because it had concerns that the services provided

---

[22] Prior to the Second Hearing on the Interim Fee Applications, the Court instructed the parties to brief and argue this issue. Possibly due to some confusion, no party briefed the specific issue of what standard the Court should use to determine whether it approved the Applicants' hourly rates under § 328 at the time the Court approved their employment. Instead, the Applicants referred to § 328's heightened standard to alter a preapproved hourly rate, and the UST simply argued that § 328 did not apply.

overlap with services provided by other professionals. *Id.* at 256. Due to the hourly rate cap, the

bankruptcy court disallowed certain fees and expenses in multiple interim fee applications and

denied the last compensation application in its entirety. *Id*. After the district court affirmed the

bankruptcy court, Zolfo Cooper then appealed to the Third Circuit. *Id.* at 257.

On appeal, the Third Circuit focused on precise language found in orders authorizing

professional employment and found that the bankruptcy court was not bound to enforce terms and

conditions due to the language found in the bankruptcy court's order, which did not contain

specific hourly rates or a contingency fee arrangement but merely the nature and range of services.

*Id.* at 262. Concerned with binding courts to specific terms "unintentionally", the Third Circuit

found that the burden should not be on the court to specify it rejects specific terms in an

employment order; rather, "the burden should rest on the applicant to ensure that the court notes

explicitly the terms and conditions [of retention] if the applicant expects them to be established at

that early point." Id. at 262. Based on this reasoning, the Third Circuit affirmed the reduction of

the Zolfo Cooper's fees. *Id.* at 263.

The Ninth Circuit follows a similar approach. In *In re Circle K Corp.*, the Official

Debentures Committee employed Houlihan, Lokey, Howard & Zukin ("Houlihan") as its financial

advisory firm. *In re Circle K Corp.*, 279 F.3d 669, 672. (9th Cir. 2002). Houlihan's application

specified that it would be paid $100,000.00 per month, stated that all fees remain subject to

subsequent court approval, and included the retainer agreement containing the monthly fee term.

*Id*. The bankruptcy court approved the application and included the monthly fee in its employment

order, but the order did not explicitly reference § 328. *Id.* After Houlihan submitted its fee

application, the bankruptcy court assessed the fees under § 330 and only granted half of the

requested fees. *Id.* On appeal, the district court reversed the bankruptcy court, finding that

Houlihan had been employed under § 328. *Id.* Further, the district court remanded to allow the bankruptcy court to utilize the "improvident" standard to determine whether a reduction in fees was warranted. *Id.*

The debtor then appealed to the Ninth Circuit, which reversed the district court and held that because Houlihan was not specifically retained under § 328, and the inclusion of language in both the application and order allowing the fees to be "subject to the review" and "subject to approval" by the bankruptcy court upon submission of a final fee application, the bankruptcy court has discretion to grant fees and expenses as appropriate under § 330. *Id.* at 674. The Ninth Circuit explained that "unless a professional is unambiguously employed pursuant to § 328, its professional fees will be reviewed for reasonableness under § 330 . . . [t]o ensure that § 328 governs the review of a professional's fees, a professional must invoke that section explicitly in the retention application . . . [and] preferably, the retention order would specify that section as well."[23] *Id.* at 674. Despite adopting an arguably stricter approach in determining prior approval of fee arrangements under § 328, the Ninth Circuit noted that, while bankruptcy courts are encouraged to identify clearly which statutory provision applies to a professional's retention, "failure to cite either § 330 or § 328 is not fatal, as the context of the retention order should ordinarily make clear which provision is applicable." *Id.* at 674, fn. 5.

On the other hand, the Second and Sixth Circuits follow a more relaxed approach in determining whether a retention or compensation agreement has been previously approved under § 328, choosing instead to undergo a totality of the circumstances analysis. In *In re Airspect Air*, the debtor retained Jeffery Nischwitz ("Nischwitz") as its counsel to litigate a contract dispute

---

[23] The Court notes that the Ninth Circuit's standard is arguably more restrictive than the Third Circuit.

under a contingency fee agreement. *In re Airspect Air., Inc.*, 385 F.3d 915, 917 (6th Cir. 2004).

Nischwitz's employment application disclosed the debtor paid an initial $7,000.00 retainer and

provided that any additional fees would be paid on a tiered contingency basis. *Id.* Nischwitz would

receive 33% of the gross settlement if the case settled two or more weeks before trial, 40% if

resolved within two weeks of trial or after commencement, and 50% if settled after trial. *Id.* The

employment application, however, failed to mention § 328. *Id*. After Nischwitz settled the cause

of action, Nischwitz filed a fee application seeking 33% of the $575,000.00 settlement. *Id*. at 919.

But the bankruptcy court only awarded Nischwitz $37,050.00 in fees, or the amount it deemed

reasonable under § 330. *Id.* The Bankruptcy Appellate Panel reversed, holding that the court had

approved the contingency agreement under § 328. *Id*. The bankruptcy case trustee and the debtor's

sole owner appealed. *Id*. at 920.

Looking mainly to the employment application and the bankruptcy court's order, the Sixth

Circuit utilized a totality of the circumstances analysis and found that the bankruptcy court never

approved the fee arrangement at issue. *Id.* at 922. Specifically, the Sixth Circuit found that the

employment application and order failed to reference § 328 or include a discussion of the

reasonableness of the fee, which the court noted was the "foundation of the § 328 inquiry". *Id.*

Further, the court explained that the employment order failed to mention the contingency

arrangement and instead, required the parties to submit applications for fees to the court for

approval. *Id.* Last, the court considered the failure of either party to invoke § 328 in briefing and

argument on the objections to the fee application. *Id*.

Like the Sixth Circuit, the Second Circuit adopted a totality of the circumstances approach

in *In re Smart World Tech., LLC*, 552 F.3d 228, 233 (2d Cir. 2009). In *Smart World*, the debtor's

bankruptcy counsel hired Riker, Danzig, Schere, Hyland & Perreti, LLP ("Riker Danzig") to

represent the debtor in an adversary proceeding. *Id.* at 230. Riker Danzig then sought employment under §§ 327 and 328 based on a contingency fee arrangement. *Id.* At the hearing on Riker Danzig's employment application, the bankruptcy court made comments that the contingency arrangement itself addressed the reasonableness of the fee and approved the retention application. *Id.* at 231. While the employment order included the exact percentage of fees to be paid to Riker Danzig, it did not mention § 328. *Id.*

After the litigation concluded (and Riker Danzig filed its fee application), the bankruptcy court found that it had previously approved the contingency fee but several events incapable of being anticipated necessitated a fee reduction. *Id.* On appeal, the district court agreed as to preapproval of the contingency fee but disagreed that the "improvident" standard necessitated a reduction of fees. *Id.* at 232. As a result, the district court reversed and ordered a fee award in compliance with the original contingency agreement. *Id.* On appeal to the Second Circuit, the court had "little difficulty" finding that the retention order was a preapproval under § 328 because, although the employment order failed to invoke § 328, the application expressly invoked § 328(a). *Id.* at 233. Further, the Sixth Circuit found that the language[24] used in the application and a letter between the parties confirming the contingency fee term was incorporated into the order and authorized payment in accordance with the application. *Id.* Last, the court noted that the United States Trustee's own objection recognized that the application was made under § 328(a), and the bankruptcy court made comments at the hearing suggesting that his preapproval was made under § 328(a). *Id.* at 233-34.

---

[24] The following language was used in the application at issue: "The Debtors wish to retain the law firm of Riker, Danzing, Scherer, Hyland & Perretti, LLP . . . as their Special Counsel in this Chapter 11 proceeding pursuant to 11 U.S.C. §§ 327 and 328. . . ." *Id.* at 233-34.

Having explained the split in authority concerning preapproval of fees under § 328, the Court is prepared to adopt a standard. After review of the competing tests, this Court is of the opinion that a totality of the circumstances test should be used to determine whether an applicant's fee arrangement was preapproved under § 328. The Court agrees with other circuit appellate courts that any other test is too constrictive and prevents this Court from considering all the facts and circumstances in addressing approval of an applicant's fee arrangement at the time of employment. Further, like the cases above which utilized factors in assessing the totality of the circumstances, the Court will adopt several factors to make its determination: (1) whether the employment application or order referenced § 328; (2) other language and content of the employment application and order; (3) whether there has been a discussion as to the reasonableness of the fee in either the employment application or order; and (4) any other relevant information the court may use to determine preapproval of a fee arrangement. As with any factors utilized in an analysis, the presence or absence of any of these factors are not outcome determinative, and the Court may give more weight to some factors over others depending on the circumstances.[25] Turning to this bankruptcy case, the Court must now determine whether it approved the Applicants' hourly rates under § 328(a) at the time it approved their employment.

### a.  References to § 328

To begin, both the Employment Applications and the Employment Orders explicitly refer to approval of the Applicants' employment under § 328. Indeed, in paragraph six of the Employment Applications, the Applicants specifically pled that "[p]ursuant to §§ 327(a) and

---

[25] To be clear, the Court is not adopting factors for determining the reasonableness of professionals' fees at the time of employment as that issue is not before the Court. See, e.g., *In re Energy Partners LTD., et al.*, 409 B.R. 211 (Bankr. S.D. Tex. 2009) (adopting factors to determine whether professionals should be employed under § 328(a) at the time of the filing of the employment application).

328(a) of the Bankruptcy Code", the Debtor sought to employ Jones Walker and Cozen. The

Employment Applications again referenced § 328 in paragraph 21, requesting entry of an order

"pursuant to 11 U.S.C. §§ 327(a), 328(a), and Fed. R. Bankr. P. 2014(a)". Likewise, the Court's

Employment Orders initially referenced the Applicants' requested employment under § 328(a) and

then approved their employment under § 328(a) in paragraph two. The Court can easily distinguish

the facts and circumstances here with those faced by the court in *Airspect Air:* neither the

employment application nor order in *Airspect Air* referenced § 328. Even more, the parties failed

to brief or argue preapproval. Here, the Applicants' included § 328(a) in the Employment

Applications, and the Court's Employment Orders explicitly approved the Applicants'

employment under § 328(a). Further, the Applicants eventually briefed and argued preapproval at

the Second Hearing. Even in *Smart World*, the court determined it previously approved the

applicant's contingency fee under § 328 even though the applicants there only referenced § 328 in

the employment application, and it was not included in the employment order. Therefore, this

factor weighs in favor of preapproval under § 328.

### b. *Content of the Employment Applications and Orders*

Before approving the Applicants' employment, the Court thoroughly reviewed each

provision contained in the Employment Applications. The Court found the Employment

Applications sufficiently thorough in that the Applicants provided a detailed breakdown of each

law firm's responsibilities, duties, skillset, and capabilities. In addition, both Employment

Applications included relevant facts about Feilitech and its operations, the types and amounts of

debts (which considering the international aspect of Feilitech's operations, included approximately

$400,000.00 in disputed customs duties), and other indicators of potential complexities concerning

the bankruptcy case. The Employment Applications also referenced the First Day Declaration,

which as mentioned above, contained additional information about Feilitech and the status of the entity and its revenue as of the Petition Date.

More germane to this discussion, although the Applicants did not provide the actual retention agreements between Feilitech and their respective law firms, the Applicants included a dedicated section in the Employment Applications relating to compensation in paragraphs 15 through 20. Those paragraphs set out the proposed hourly rates of the attorneys and paraprofessionals. Again, this is a departure from the facts faced by the Sixth Circuit in *Airspect Air* where the applicants failed to include any details regarding the contingency fee arrangement. Because the Applicants provided sufficient information regarding their hourly rates in their Employment Application, the Court finds that this factor weighs in favor of preapproval of the Applicants' hourly rates under § 328.

### c. *Reasonableness discussion*

The Court acknowledges that neither the Employment Applications nor the Employment Orders discussed the reasonableness of Applicants' proposed hourly rates. The Court did, however, assess this issue prior to approving the Applicants' employment. Generally, when analyzing the reasonableness of the proposed hourly rate under § 328, the court must make a "preemptive" determination of the benefit that a professional's services will provide to the bankruptcy estate. *Energy Partners*, 409 B.R. at 229. This is different than analyzing the reasonableness of a professional's fees and services in hindsight under § 330 as discussed more below.

At the time the Court approved the Applicants' employment, the Court considered the Applicants' hourly rates in the context of the information it had based on the filings between the Petition Date to the entry of the Employment Order in March of 2023. More specifically, the Court considered that both law firms include board certified attorneys who possess years of experience

Case 23-10599-SDM   Doc 237   Filed 12/21/23   Entered 12/21/23 14:02:03   Desc Main
Document      Page 25 of 52

in complex Chapter 11 cases. The Court also considered the proposed hourly rates and found that, while higher than the $450.00 hourly rate advanced by the UST, the hourly rates were nevertheless warranted based on other highly skilled attorneys' hourly rates who practice in this Court from Mississippi and beyond. Further, the Court assessed the circumstances surrounding the commencement of Feilitech's bankruptcy case and originally anticipated it to be a complex case based on the international aspect of the Debtor's business model.

As aptly noted by Geno, the Court also contemplated that services provided by counsel to a debtor are different than other professionals when determining what benefit the services provided would be to the bankruptcy estate and any proposed fee arrangement. A debtor's attorney, especially an attorney for a debtor-in-possession, is actively involved in every aspect of the internal operations, must interact with all interested parties and creditors, and finally navigate through the bankruptcy court to effectively advance the bankruptcy case. From this Court's perspective, in assessing the reasonableness of proposed fee arrangements under § 328, a debtor's counsel in a Chapter 11 bankruptcy case is different than other professionals, for example, counsel for an unsecured creditors' committee or an accountant, where any benefit to the bankruptcy estate may be less certain. The Court must take that into account at the outset of a bankruptcy case, and the Court did just that when assessing the hourly rates proposed by the Applicants. Nevertheless, because no reasonableness discussion was included in the Employment Applicant or the Employment Orders, this factor weighs against preapproval of the Applicants' hourly rates.

### d.   Other relevant information

The Court finds at least two additional facts relevant to its analysis. First, the Employment Applications and Orders specify that the compensation and reimbursement provisions are subject

to the limitations of Local Bankruptcy Rule 2014-1(a)(2)[26], which references Bankruptcy Rule 2016. The Court finds this provision of the Local Bankruptcy Rules problematic to the extent it conflicts with the approval of hourly rates or contingency fee arrangements at the outset of employment as provided in the Bankruptcy Code under § 328. While the Local Bankruptcy Rule does not reference § 328, if one were to read our Local Bankruptcy Rules as conflicting with § 328, which explicitly allows for preapproval of compensation provisions (contingency fees, hourly rates, etc.) in employment orders, then the Bankruptcy Code must prevail. Whether the Local Bankruptcy Rules need amendment to clarify this point is a discussion for another day.

In any event, the Court will interpret the Applicants' insertion of this language in the Employment Applications and the Employment Orders like the conditional language used in the employment order in *National Gypsum*. Just like *National Gypsum* where the Fifth Circuit determined the bankruptcy court preapproved a fee agreement due to the court's approval in its order on the "terms and conditions" of the retention agreement, any reference to the Local Bankruptcy Rules here requiring approval of a fee contract or compensation via separate application when the Applicants are seeking preapproval of hourly rates under § 328 is merely to allow the bankruptcy court to control the compensation process in the event of later unanticipated circumstances affecting the reasonableness of the agreed fee. In other words, the bankruptcy court must still assess the reasonableness of the fee using the improvident standard under § 328 at the time of any compensation application. Further, the Court views the reference to Local Bankruptcy Rule here as a pro forma, unlike the court in *Airspect Air* where insertion of conditional language

---

[26] Local Bankruptcy Rule 2014-1 provides in part that "[a]n order approving the employment of attorneys, accountants, appraisers, auctioneers, agents, or other professionals will not constitute approval of the professional's fee contract or compensation. A request for approval of a professional's fee contract or compensation will be made by separate application in accordance with Fed. R. Bank. P. 2016 and approved by a separate order." Miss. Bankr. L.R. 2014-1(a)(2).

requiring later application to the court weighed against finding preapproval under § 328. Here, the

conditional phrase concerning our Local Bankruptcy Rule is at least neutral in the overall analysis

neither weighing for or against the Court's prior approval of the Applicants' hourly rates.

Second, the Court must address the Applicants reference to § 330 "criteria" and the

*Johnson* factors in the Interim Fee Applications. At worse, the Applicants merely forgot they had

been employed under § 328 by referencing § 330's reasonableness factors and the *Johnson* factors.

At best, the Court finds the fact that the Interim Fee Applications reference § 330 is of no

consequence. Section 330(a) provides that subject to § 328, the court may award a professional

employed under § 327 reasonable compensation. 11 U.S.C. § 330(a)(1).[27] Thus, any professional

employed under § 327, even when a fee arrangement has been previously approved under § 328,

must file a fee application under § 330. This information, while relevant, is at least neutral in the

Court's analysis.

### e. Summary

After considering the totality of the circumstances, which includes application of the newly

adopted factors, and upon careful examination of the arguments and testimony presented, the Court

concludes that it did approve the Applicants' hourly rates under § 328 at the time the Court

approved the Applicants' employment. The Employment Applications and Employment Orders

specifically reference employment under § 328, and the Court expressly approved employment

based on the agreed upon terms between Feilitech and the Applicants. Further, considering the

thoroughness of the Employment Applications and other pleadings at the time of employment, the

---

[27] See *In re Betancourt*, 2022 WL 1272140, at *4 (Bankr. N.M. April 28, 2022) (noting that no ambiguity is created if an employment application refers to § 330 when discussing fee applications, so long as other parts of the employment application and order make it clear that the fee arrangement was preapproved under § 328).

Applicants provided more than sufficient information to put all parties on notice of the agreement between Feilitech and the Applicants concerning their agreed upon hourly rates. Even though the Court did not include a reasonableness discussion in the Employment Orders, that is the only factor weighing against preapproval of the Applicants' hourly rates. The absence of that factor, alone, is not enough under these circumstances to sway the Court's finding that it approved the Applicants' hourly rates at the time the Court approved their employment.[28]

   2. *The "improvident" standard applied.*

Now that the Court determined it previously approved the Applicants' hourly rates, the Court must now turn to whether those hourly rates should be reduced under the improvident standard. In addition to the standard set out above, the Fifth Circuit has emphasized that for the availability of highly skilled professionals in complex capital restructuring and successful corporate reorganization, it is crucial that they have clarity about their compensation for their expertise and dedication. *Barron II,* 325 F.3d at 690 (quoting *National Gypsum*, 123 F.3d at 862-63). Once fee arrangements are deemed acceptable, it becomes the duty of the courts to safeguard these agreements and the associated expectations. *Id.* Further, Congress's goal in establishing § 328 was to eliminate uncertainty, even at the risk of potentially underpaying or conversely providing a windfall to professionals retained under § 328. *ASARCO,* 702 F.3d at 258 (quoting *In re Coho Energy, Inc.*, 395 F.3d at 204-05.). To further clarify the improvident standard for the parties, the Court believes that a more thorough discussion of *ASARCO* is warranted.

---

[28] The Court points out that even if it would have adopted an arguably stricter approach, the outcome would not likely change. The Court understands the concerns discussed by the Third Circuit in *Zolfo* regarding the unintentional binding of courts to certain terms of employment or shifting the burden to courts to reject specific terms in employment orders. Even so, the Court finds here that the Employment Applications specifically included the proposed hourly rates, and the Employment Orders explicitly employed the Applicants under those employment terms.

In *ASARCO*, the bankruptcy court approved the debtor's application to retain Lehman Brothers ("Lehman"), under § 328, as its financial advisor. *Id*. at 254. The engagement letter between the debtor and Lehman detailed the scope of Lehman's responsibilities and the agreed compensation: $100,000.00 monthly for the first twenty-four months and $75,000.00 per month thereafter. *Id*. at 255. Months later, the debtor applied to the court seeking to expand the scope of Lehman's engagement and increase their compensation to $150,000.00 monthly and add a "discretionary fee" based on the successful outcome of the bankruptcy due to Lehman's increased role in the bankruptcy case. *Id*. at 255. In Lehman's second fee application, the debtor requested permission to pay Lehman $1 million for services rendered in connection with three pending fraudulent transfer proceedings. *Id.* The court subsequently approved the debtor's request to pay Lehman for the services related to the fraudulent transfer proceedings but denied all other requests finding that Lehman was bound by the terms of its original agreement. *Id*.

In September of 2008, Lehman's parent company filed its own Chapter 11 bankruptcy case, which resulted in Lehman being acquired by Barclays Capital, Inc. ("Barclays"). *Id.* The court approved a revised engagement letter between the debtor and Barclays in which Barclays would receive $225,000.00 a month, a $5 million transaction fee, and the ability to seek a discretionary fee based on the successful outcome of the case. *Id*. at 256. Barclays's services led to "one of the most successful bankruptcies in United States history". *Id*. However, when Barclays submitted its final fee application requesting $1.2 million for services rendered outside the scope of the initial agreement, a $2 million success fee, and a $6 million auction fee, the bankruptcy court only awarded $975,000.00 for unanticipated services. *Id*.

The debtor appealed the $975,000.00 award, and Barclays appealed the denial of its success and auction fees. *Id.* The district court affirmed the bankruptcy court's holding, which led to the

debtor's appeal of the $975,000.00 fee award and Barclay's appeal concerning the denial of its $2 million success fee.[29] *Id*. The debtor argued that the court erred in awarding the additional $975,000.00 because the circumstances that necessitated the additional services provided by Barclays were not incapable of anticipation. *Id*. at 257. Barclays contended that at the outset, the process was expected to take the form a quick sale, which would take about one month. *Id*. at 262. Further, Barclays argued that the unexpected and continuous exodus of employees required the development of an employee retention plan, a service that was outside of Barclays's scope of employment. *Id*.

The Fifth Circuit noted that the bankruptcy court's reliance on employee departures and internal dysfunction was misplaced, as the circumstances were capable of being anticipated even if not anticipated at the time. *Id*. at 264. Further, the Fifth Circuit found that Barclays should have been aware that the "quick stop in Chapter 11" of which Barclays anticipated could potentially drag on much longer, as at the time of filing there was an ongoing labor strike and insufficient management. *Id*. The Fifth Circuit ultimately concluded that the bankruptcy court erred in awarding Barclays a $975,000.00 fee enhancement because all subsequent developments in the ASARCO proceeding were capable of being anticipated within the meaning of § 328. *Id*. at 267.

The takeaway from *ASARCO*? The standard for deviating from the originally approved fee arrangement under § 328 is stringent. Here, the UST made no argument that the terms and conditions of the Applicants' fee arrangement with Feilitech have proved to be improvident. Instead, the UST merely argues that the bankruptcy case was not so complex as to justify the Applicants' hourly rates. In addition, the UST argues that § 328 does not apply. The latter argument fails for one obvious reason: the Court already determined that it approved the Applicant's hourly

---

[29] Barclays did not appeal the denial of its request for a $6 million auction fee.

rates under § 328 at the time it approved their employment. The Court believes that a discussion as to the level of variance from initial expectations regarding complexity is required to disturb a preapproved fee agreement. While there has been some debate between the parties concerning the complexity of this bankruptcy case, *ASARCO* stands for the proposition that just because a bankruptcy case ends up more complex than anticipated, unanticipated (but anticipatable) events are not grounds for disturbing a fee amount approved under § 328. See *ASARCO*, 702 F.3d at 256. *ASARCO* makes clear that § 328 prohibits the award of fees *above* the amount previously agreed absent circumstances not capable of being anticipated. Logic dictates that § 328 does not permit this Court to *reduce* agreed upon hourly rates under similar circumstances. Here, the UST contends that this bankruptcy case does not rise to the necessary level of complexity to warrant the hourly rate in the Applicants' fee agreements. But as illustrated above, a professional whose compensation has been fixed under § 328 should have their expectations protected. The fact that a Chapter 11 case is arguably less complex than anticipated fails to meet the improvident standard. Therefore, this Court finds no justification under § 328 to lower the Applicants' hourly rates.

    *3. The reasonableness and necessity of the Applicants' hours expended under § 330.*

    Despite the Court's findings above, it must still determine whether the services rendered (or hours expended) by the Applicants are reasonable. By its very terms, § 330 allows compensation for actual and necessary services rendered, albeit subject to § 328. Therefore, while the Applicants' hourly rates may have been preapproved under § 328, the Court may still inquire into the reasonableness of the number of hours expended. See *ASARCO,* 702 F.3d at 261, n.10 (internal citations omitted). A court may award professional fees not only for services that are necessary "in that those services actually produce a material benefit to the estate", but also for those services that are objectively reasonable at the time they were rendered, even if they

"ultimately . . . fail to produce an actual material benefit" to the bankruptcy estate. *Baron &
Newburger, P.C. v. Texas Skyline, Ltd. (In re Woerner)*, 783 F.3d 266, 274 (5th Cir. 2015)
(effectively abrogating the "material benefit" requirement imposed by *Andrews & Kurth L.L.P. v.
Family Snacks, Inc. (In re Pro-Snax Distributors, Inc.)*, 157 F.3d 414 (5th Cir. 1998)). Courts may
not, however, award compensation for unnecessarily duplicative services, services that were not
reasonably likely to benefit the bankruptcy estate at the time they were performed, or for services
not necessary to the administration of the bankruptcy case. 11 U.S.C. § 330(a)(3), (4).

The UST does not dispute many of the hours expended or the services rendered. The UST
does complain about the Applicants' billing related to the attendance at two hearings and Cozen's
compensation request for 9.6 hours for plan preparation. The Court will address both concerns.
Local Bankruptcy Rule 9010 provides that an attorney which has been admitted pro hac vice must
associate with local counsel and that local counsel must comply with the association and duties of
the resident attorney provision found in Local Civil Rule 83.1(d)(3). Miss. Bankr. L. R. 9010-1(b).
Local Civil Rule 83.1 provides:

> [. . .] At least one resident attorney must [. . .] appear and participate in all trials, in
> all pretrial conferences, case management conferences, and settlement conferences,
> hearings and other proceedings conducted in open court, and all depositions or other
> proceedings in which testimony is given.

L. U. Civ. R. 83.1(d)(3).[30]

---

[30] In other Chapter 11 bankruptcy cases, this Court has routinely emphasized the
importance of following any applicable Local Bankruptcy Rule. Besides the obvious aid to the
parties and the Court in the administration of the bankruptcy case, sometimes the consequences of
failing to abide by the local rules are severe. Indeed, the Fifth Circuit has held that failure to comply
with local rules may lead to dismissal of an appeal. See, e.g., *In re Goldblatt*, 203 Fed. Appx. 545,
548 (5th Cir. 2006) (affirming the district court and finding that the failure to file a supporting brief
as a separate document as required by the local rules warranted dismissal of an appeal).

The above Local Bankruptcy Rule and Local Civil Rule are clear that the Applicants' attendance as lead counsel and local counsel at the hearings on March 1, 2023 and April 18, 2023 was not only necessary but also a requirement. And as gleaned from the Fifth Circuit in *Goldblatt*, failure to comply with certain local rules could have negative consequences. While the Court certainly appreciates the UST's efforts to ensure that the Applicants did not engage in duplicative billing practices, the Court agrees with the Applicants and finds that their attendance at these hearings was neither unnecessary nor duplicative.[31]

As to the UST's assertion that Cozen's 9.6 hours billed for work related to filing a Chapter 11 plan was improper because Feilitech has not proposed a plan, the Court disagrees. In paragraph 12 of Cozen's Employment Application, the services to be provided by Cozen are explicitly enumerated. Paragraph 12(c) states that Cozen will assist the Debtor in the negotiation, formulation, and drafting of a Chapter 11 plan. Further, in section L of Cozen's Interim Fee Application, Cozen spent the 9.6 hours providing the following services: (1) communicating with Feilitech, Johnson, and Geno regarding the plan and the appointment of a Chapter 11 Trustee or conversion of the case; (2) the preparation of a § 1188 status report; and (3) participating in two plan status hearings. All those services are further explained in the 19-time entries found in Exhibit A to Cozen's Interim Fee Application. While Cozen sufficiently explains the 9.6 hours in which it is seeking compensation, the question the Court must answer is whether or not it is proper for Cozen to be compensated for such work when no plan had been filed at the time it initially sought to be compensated.

---

[31] The Court also appreciates the Applicants' positions in their Employment Applications that they would attempt to reduce any duplicative replication of services and billing as much as possible. And the Court is satisfied with their efforts up to this point in this bankruptcy case. While not every bankruptcy case necessitates out of state counsel, the Court appreciates the skill and diligence provided by both Jones Walker and Cozen as the Debtor's counsel here.

As illustrated in Exhibit A to Cozen's Interim Fee Application, all services that merge to create the 9.6 total hours related to the Chapter 11 plan take place between March 20, 2023 and May 30, 2023, almost a month prior to the June 28, 2023 deadline for filing proofs of claims. Regardless of whether a proposed plan has been filed, the services provided in connection with filing a plan would necessarily be provided before one is filed. In addition, there is no prohibition in the Bankruptcy Code or elsewhere for a debtor's counsel to formulate a plan before the deadline for filing claims. In some circumstances, it may be prudent to do so. The Court believes that these services and the 9.6 hours Cozen expended were performed in furtherance of the bankruptcy estate's interest and were necessary to finalize a plan. Therefore, the Court finds that the services objected to by the UST were reasonably likely to benefit the bankruptcy estate at the time performed. As to the services not objected to by the UST, the Court finds all other hours were reasonably likely to benefit the bankruptcy estate at the time they were rendered. The Court finds that the services provided by both Jones Walker and Cozen were reasonable.

*4. Expenses*

As to the Applicants' expenses, Jones Walker is requesting expense reimbursement in the amount of $2,187.14, which consist of court fees, copying services, and travel related expenses. Similarly, Cozen requests expense reimbursement in the amount of $3,734.73, which consists of car rentals, delivery services, filing and pacer fees, serving process, and travel related expenses. The UST did not challenge the reasonableness or necessity of these expenses. The Court finds that all expenses incurred were reasonably incurred incidental to the performance of reasonable and necessary professional services. Therefore, both law firms may recover the full amount of their requested expenses.

**B.  Status of the Prepetition Retainers**

The final component of the UST's objection is that Cozen failed to disclose, or at least provide sufficient information, regarding its prepetition retainer in Cozen's Employment Application. Section 329 requires a debtor's attorney to disclose a statement of the compensation paid or agreed to be paid. 11 U.S.C. § 329. Bankruptcy Rule 2016 mirrors the requirements of § 329 and requires a supplemental statement for any payment or agreement not previously disclosed. Fed. R. Bankr. P. 2016(b). Further, Bankruptcy Rule 2014 requires the employment application to contain any proposed arrangement for compensation and any connection to the debtor. Fed. R. Bankr. P. 2014(a).

Looking to Cozen's Employment Application filed on the Petition Date, paragraph 16 discloses that Feilitech paid Cozen a retainer as "prepayment" for services rendered before and related to the Chapter 11 bankruptcy case. Further, Cozen indicated in its Disclosure filed on March 14, 2023 that Feilitech paid $170,770.50 as a prepetition retainer. Based on information provided by Guon, Cozen applied the retainer to services rendered and expenses incurred prepetition. According to Cozen's Employment Application and Interim Fee Application, the remaining balance of the Prepetition Retainer on the Petition Date was $46,022.54. Although Cozen filed its Employment Application on February 28, 2023, three weeks prior to the Disclosure, the Court believes that the inclusion of the remainder of the retainer in their Employment Application, coupled with full disclosure of the prepetition retainer in the Disclosure, was sufficient to satisfy the requirements under the applicable Bankruptcy Rules.

While Cozen may have sufficiently disclosed the prepetition retainer, the Court will briefly discuss the status of the prepetition retainers for both Applicants. In the Employment Applications and Employment Declarations, Johnson and Guon state that they will be compensated from

bankruptcy estate funds *after* application of the prepetition retainers. Interestingly, in the Interim Fee Applications, they now request to be compensated from bankruptcy estate funds prior to utilizing the balance of the prepetition retainers. Under normal circumstances, the Court would engage in an analysis of the retention agreements to determine the nature of the retainers at issue. See *In re Blackburn,* 448 B.R. 28, 35 (Bankr. D. Idaho 2011) and *In re Viscount Furniture Corp.*, 133 B.R. 360, 366 (Bankr. N.D. Miss. 1991). In other words, the Court would determine if the retainers at issue are classified as a security retainer, where the Debtor retains an interest in the balance and that balance remains property of the bankruptcy estate under § 541. *Id.*

But alas, no retention agreements have been produced within the record. Regardless, the Court need not engage in such an analysis here because the Employment Orders effectively employed the Applicants based on the terms in the Employment Applications and Employment Declarations, which provided that the Applicants would be compensated first from the remaining balance of their prepetition retainers.[32] Thus, the Court finds that the remaining balances of $46,022.54 and $14,693.00[33] of the prepetition retainers should be applied to reduce the compensation sought by the Applicants for the postpetition services in both Interim Fee Applications.

---

[32] At the Second Hearing, Johnson stated that Jones Walker, like Cozen, utilized an "evergreen retainer". Without delving into too much detail on a term of art in the legal practice, the client pays a sum upfront to the attorney's trust account, and the attorney invoices against that sum. Again, while the Court is not engaging in any property of the estate analysis, the use of this type of retainer indicates that Johnson and Guon would need to seek this Court's permission to apply the remaining balance of the prepetition retainer to any attorneys' fees and expenses going forward because the prepetition retainer balances held in their trust accounts would be property of the bankruptcy estate.

[33] Jones Walker indicated in its Interim Fee Application that there was $14,693.00 balance remaining from their initial $20,000.00 retainer.

### C. The Appendix B Guidelines

The Court will briefly address the applicability of the UST's Appendix B Guidelines in this bankruptcy case. The Applicants contend that the UST should not have objected (at least to Cozen's hourly rates) because Cozen is charging hourly rates allowed in the location of its primary office, i.e, its forum hourly rates. The Applicants base their argument on the language contained in the Appendix B Guidelines. Section (B)(2)(l) of the Appendix B Guidelines provides:

> Whether the applicant increased the hourly rates of its professionals and paraprofessionals based solely on the geographic location of the bankruptcy case. The United States Trustee will not object to "non-forum" rates of professionals when the "non-forum" rates are based on the reasonable rates where the professionals maintain their primary office, even if the locally prevailing rates where the case is pending is lower (i.e., a professional may bill the same reasonable rate in any forum). Conversely, the United States Trustee will object if professionals increase their rates based on the forum where the case is pending when they bill lower rates where they maintain their primary offices.

*Appendix B Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under United States Code by Attorneys in Larger Chapter 11 Cases*, 78 Fed. Reg. 36248, 32650 (June 17, 2013).

Based on the Court's interpretation, it appears that the Appendix B Guidelines suggest that the UST will not object to a professional's rate if the requested rate is higher than the local rate so long as the requested rate is the same rate the professional charges in their home district. But even as the Applicants concede, the Appendix B Guidelines do not limit the UST's discretion to object to any application. See *Appendix B Guidelines*, 78 Fed. Reg. at 36248. Based on the language of the Appendix B Guidelines, the Court believes that the UST may object to any fee application if that objection is based soundly in the Bankruptcy Code, Bankruptcy Rules, and relevant case law.

But whether there was an objection filed regarding the Interim Fee Applications is also missing the point. The Court has a duty in all Chapter 11 cases to review each application, and it must determine whether to approve or disapprove the Interim Fee Applications here based on the

applicable law.[34] Even if the UST objects to compensation requested in an employment or fee application, the Court's analysis of any application(s) remains the same. In conclusion, while the Appendix B Guidelines serve to guide the UST in performing its statutory duties and functions, they do not influence this Court's independent review and ultimate decision to approve or disapprove an employment or fee application.[35]

**D. Reasonableness of the Applicants' Hourly Rates under § 330**

As discussed above, the Applicants' hourly fee arrangements were preapproved under § 328. The UST failed to show that those hourly rates should be reduced according to the improvident standard under § 328. Further, the Court rejected the UST's contention that some of the Applicants' services rendered were duplicative and unnecessary, which did not warrant reduction of overall compensation under § 330 either. Normally, under these circumstances, the Court's work would be complete. The Court is, however, concerned by the UST's reliance on *Sanderson Plumbing* and § 330 not only in this bankruptcy case where § 328 is applicable, but also in other cases where a professional's hourly rate would be subject to review at the compensation stage under § 330's reasonableness factors and the *Johnson* factors.

---

[34] Fee applications in Chapter 11 bankruptcy cases are not like those in routine Chapter 7 or Chapter 13 bankruptcy cases where bankruptcy courts need not review reasonableness of compensation in every case before it, as such a requirement would be a waste of both courts' and attorneys' time. 3 COLLIER ON BANKRUPTCY ¶ 330.03 (16th ed. 2023). To further the interests of efficiency, many jurisdictions have adopted "presumptive" or so-called "no-look" fee guidelines for routine Chapter 7 and Chapter 13 cases. These guidelines typically provide that fees at or below a defined threshold may be deemed "reasonable" without further review. *Id.*

[35] The Applicants aptly note that the Appendix B Guidelines do not supersede the Local Bankruptcy Rules, court orders, or other controlling authority. *Joint Submission of Additional (1) Proof Concerning Current Market Hourly Rates of Attorney's Fees for Bankruptcy Practitioners in The State of Mississippi and (2) Arguments Regarding the U.S. Trustee Guidelines for Reviewing Applications for Compensation,* (the "Joint Submission") ¶. 38, Dkt. #169.

Indeed, the Court continues to see the UST employ *Sanderson Plumbing* to object to attorneys' fee applications where attorneys bill at hourly rates exceeding the $425.00 to $450.00 range.[36] While the court in *Sanderson Plumbing* certainly employed the correct analysis under the facts presented in that case, the UST's approach in objecting to fee applications raises questions: How does the UST derive the current hourly market rate attorneys (or other professionals) charge in Mississippi on an ongoing basis? If the UST simply objects to a professional's hourly rate above $450.00, do attorneys continue to charge at or below that hourly rate to avoid UST objections as opposed to charging their normal hourly rates or what their clients are willing to pay? As a result, are bankruptcy courts, including this Court, implicitly adopting an approach that fails to comply with the Bankruptcy Code? The Court feels it necessary to address these questions if nothing else to provide clarity for the attorneys who practice before it, and the Court will use the Interim Fee Applications at hand to illustrate the proper application of § 330. In doing so, the Court believes that a more thorough discussion of *Sanderson Plumbing* and § 330 in this Opinion and Order is warranted.[37]

The Court begins with the relevant law. Under § 330, a bankruptcy court may award a professional person employed under § 327 "reasonable" compensation. 11 U.S.C. § 330(a)(1)(A). To determine the amount of reasonable compensation to be awarded to a professional person, courts consider the "nature, extent, and value of such services" by taking into account all relevant factors, including:

(A) the time spent on such services;

---

[36] See *Joint Submission*, ¶ 19, Chart 1. (Dkt. #169). As discussed more below, the Court also notes that *Sanderson Plumbing* found the prevailing hourly rate of approximately $425.00 to be reasonable in that bankruptcy case. The UST claims now that the prevailing hourly rate in the community ranges from $425.00 to $450.00.

[37] Alternatively, the Applicants argued their hourly rates are reasonable under § 330 if § 328 is not applicable.

(B)  the rates charged for such services;

(C)  whether the services were necessary to the administration of, or beneficial at
the time at which the service was rendered toward the completion of a case
under this title;

(D)  whether the services were performed within a reasonable amount of time
commensurate with the complexity, importance, and nature of the problem,
issue, or task addressed;

(E)  with respect to a professional person, whether the person is board certified or
otherwise has demonstrated skill and experience in the bankruptcy field; and

(F)  whether the compensation is reasonable based on the customary compensation
charged by comparably skilled practitioners in cases other than cases under this
title.

11 U.S.C. § 330(a)(3)(A)-(F). Further, as illustrated above, the Fifth Circuit has opined that a court

may compensate an attorney for services that were reasonably likely to benefit the bankruptcy

estate at the time the service was rendered. *In re Woerner*, 783 F.3d 266, 273 (5th Cir. 2015).

Professionals may be compensated for services even when those services fail to produce an actual

or material benefit so long as the services were objectively reasonable at the time they were

performed. *Id*. at 274.

While § 330 provides a list of factors for bankruptcy courts to consider when determining

the amount of reasonable compensation to be awarded, the Fifth Circuit provides a framework for

bankruptcy courts to follow when making such a compensation determination. First, the

bankruptcy court must calculate the amount of the lodestar, which is "equal to the number of hours

reasonably expended multiplied by the prevailing hourly rate in the community for similar work."

*CRG Partners Group, L.L.C. v. Neary (In re Pilgrim's Pride Corp.)*, 690 F.3d 650, 655 (5th Cir.

2012) (citing *In re Lawler*, 807 F.2d 1207, 1211 (5th Cir. 1987); *In re On-Site Fuel Service, Inc.*,

627 B.R. 644, 657 (Bankr. S.D. Miss. 2021) ("Under the lodestar method, a court first determines the compensable hours billed and then calculates a reasonable hourly rate for the compensable services . . . the resulting sums are multiplied to arrive at the lodestar amount.").

Once a bankruptcy court arrives at the lodestar amount, the court may adjust the lodestar amount either up or down based on the factors enumerated in § 330 and after consideration of the twelve factors listed in *Johnson. Pilgrim's Pride*, 690 F.3d at 656 (internal citations omitted). The *Johnson* factors are as follows:

> (1) the time and labor required;
>
> (2) the novelty and difficulty of the questions;
>
> (3) the skill requisite to perform the legal service properly;
>
> (4) the preclusion of other employment by the attorney due to acceptance of the case;
>
> (5) the customary fee;
>
> (6) whether the fee is fixed or contingent;
>
> (7) time limitations imposed by the client or the circumstances;
>
> (8) the amount involved and the results obtained;
>
> (9) the experience, reputation, and ability of the attorneys;
>
> (10) the "undesirability" of the case;
>
> (11) the nature and length of the professional relationship with the client; and
>
> (12) awards in similar cases.

*Johnson*, 488 F.2d at 717-19. Bankruptcy courts have "considerable discretion" when determining whether an upward or downward adjustment of the lodestar is warranted. *Pilgrim's Pride*, 690 F.3d at 656 (citing *In re Cahill*, 428 F.3d 536, 540 (5th Cir. 2005)). Finally, the burden rests on the attorney requesting compensation under § 330(a) to justify the services rendered. *Matter of Sylvester*, 23 F.4th 543, 549 (5th Cir. 2022).

1.  *A review of Sanderson Plumbing*

Because the UST consistently relies on *Sanderson Plumbing* for determining the prevailing

hourly rate in Mississippi, a review is appropriate. In *Sanderson Plumbing*, Lowenstein Sandler

LLP ("Lowenstein") filed an application for compensation and reimbursement of expenses based

on its representation of the unsecured creditors committee. *Sanderson Plumbing*, Case No. 13-

14506-JDW, Dkt. #597 at 6. Lowenstein sought hourly rates in the amount of $544.00 to $656.00

for partners, $424.00 to $429.00 for counsel, $264.00 to $276.00 for associates, and $152.00 to

$196.00 for paralegals. *Id*. On the date the fee application was set for hearing, none of

Lowenstein's attorneys appeared, no affidavits or declarations attesting to other attorneys' hourly

fees were provided, and no continuance was requested. *Id.* at 7.

The court commented that while out-of-state counsel may be necessary in some bankruptcy

cases, there was insufficient evidence to show why it was necessary in that case. *Id.* at 23.

Moreover, the court noted that Lowenstein offered no evidence as to what the prevailing rates in

Mississippi were at the time. *Id.* Therefore, due to Lowenstein's failure to produce evidence as to

the prevailing hourly rate, the prevailing hourly market rate used in determining the lodestar was

calculated using the testimony of the trustee, other fee applications in the bankruptcy case, and the

court's knowledge of rates. *Id.* The court then determined that the prevailing market rate in the

community **"for this case"** was up to $425.00 for partners or counsel. *Id.* at 25 (**emphasis added**).

The Court ultimately found that Lowenstein had not met their burden of showing that any of the

factors in § 330 or *Johnson* warranted deviation from the lodestar amount. *Id.*

Based on the facts and circumstances faced by the court in *Sanderson Plumbing* in 2015*,*

this Court believes that the court in *Sanderson Plumbing* correctly applied the law in arriving at

the appropriate prevailing hourly rate utilizing the lodestar method. But the prevailing hourly rate

in *Sanderson Plumbing* was only applicable under the facts as known to the court in that bankruptcy case at that time. Nothing about the facts in *Sanderson Plumbing* and the information used to determine the prevailing hourly rate is equivalent to the facts as presented before this Court on the Interim Fee Applications. Indeed, the applicant in *Sanderson Plumbing* failed to even show up to the hearing or present any evidence to justify the fees being requested. Here, the Court need not expound on the voluminous documents and information submitted by all parties involved, and the Court greatly appreciates the parties' submissions to aid in the Court's ruling.

While the Court recognizes that the prevailing hourly rate in a community may remain the same for months or years, the UST's assertion that the hourly rate determined to be reasonable under § 330 for a specific case in 2015 is still the prevailing market rate (or something similar) without providing sufficient evidence in rebuttal for the Court to undergo the appropriate § 330 analysis cannot be the accepted practice before this Court any longer.[38] Based on the Court's knowledge, it is quite common for law firms like Jones Walker and Cozen to adjust their fee structure and hourly rates on a yearly basis. Again, while *Sanderson Plumbing* utilized the correct analysis in arriving at the prevailing hourly rate in 2015, and the UST is essentially urging the Court to employ that analysis, it is not proper to simply point to that case in an objection to an applicant's fees.

The Court believes this approach has, in effect, created an artificial cap on attorneys' fees not supported by the Bankruptcy Code or any relevant law. In the Fifth Circuit, the most accurate determination of reasonableness necessitates an analysis beginning with the determination of the lodestar amount, which requires the Court to determine both the reasonable number of hours and

---

[38] As mentioned above, the applicant bears the burden of proof regarding the reasonableness of any fees requested under § 330.

the prevailing rate in the community on a **case-by-case basis**. Further, in determining whether the lodestar amount should be adjusted, only one of the six factors in § 330 (and one of the 12 *Johnson* factors) suggests looking to fee awards in other bankruptcy cases. In other words, a fee award in other cases is just one of the many factors this Court utilizes in a § 330 analysis, and it certainly should not be the only metric the UST uses in responding or objecting to fee applications.

   2.  *The prevailing hourly rate in the community under § 330 in this bankruptcy case.*

   Purely for illustrative purposes, the Court believes it is necessary to undergo a § 330 analysis for future cases in which attorneys seek to have their hourly rates approved for reasonableness under § 330 at the compensation stage. The primary issue in this bankruptcy case concerns one of the two figures in calculating the lodestar amount, namely, the prevailing hourly rate in the community for similar work. Therefore, in its calculation of the lodestar amount, the Court will first begin by providing a range for the prevailing hourly rate in the community for similar work considering the hourly rates requested by Jones Walker (a Mississippi law firm) and Cozen (an Illinois law firm).

   The Court will then determine the number of hours reasonably expended in this case by the Applicants. Finally, the Court will determine whether the lodestar should be adjusted up or down based on the 12 *Johnson* factors and the factors outlined in § 330. The burden is on the applicant requesting compensation to produce satisfactory evidence "that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Lufkin*, 649 F.3d at 381 (citing *Blum v. Stenson*, 465 U.S. at 895).

   While the UST asserts that the Applicants' hourly rates exceed hourly rates of Mississippi bankruptcy attorneys, the Applicants argue that their hourly rates are commensurate with their law

firms' rate structures and more equivalent to those of other attorneys in Mississippi, which are now above the hourly rates established in *Sanderson Plumbing*. Generally, reasonable hourly rates "are to be calculated according to the prevailing market rate in the relevant community." *In re On-Site Fuel Service*, 627 B.R. at 657 (citing *Blum v. Stenson*, 465 U.S. 886, 896 (1984)).[39] Thus, the key to determining the prevailing hourly rate, and therefore the lodestar amount, is to determine what the phrases "prevailing in the community" and "relevant community" mean. The Fifth Circuit has interpreted rates "prevailing in the community" to mean what it says, and thus, has required courts to "consider the customary fee for similar work 'in the community.'" *McClain v. Lufkin Indus., Inc.*, 649 F.3d 374, 381 (5th Cir. 2011).

Generally, courts in Mississippi have held that the appropriate locality to determine customary fees for the lodestar is the community in which the district court sits. *In re Pace*, Case No. 13-14017-JDW, 2018 WL 1891311 at *3 (Bankr. N.D. Miss. March 22, 2018); *In re On-Site Fuel Service,* 627 B.R. at 657. Here, that would be the Northern District of Mississippi. While the Court has no issue with examining fees in the community of the Northern District for similar work, this Court is of the opinion that the scope of "community" for determining customary fee for similar work should be broader to include the state of Mississippi, which includes both the Northern and Southern Districts.

As the parties are aware, many of the attorneys who practice in the Northern District are located in the Southern District. It makes no sense for the Court to determine separate prevailing market rates for the legal communities in the Northern and Southern Districts based on the size of

---

[39] In *Blum*, the Supreme Court recognized that determining the market rate for an attorney's services is inherently difficult as hourly rates vary widely, corresponding with variance in experience, skill, and reputation. *Blum*, 465 U.S. at 895, n. 11.

the bankruptcy bar in this state. The Court is aware of Fifth Circuit precedent for utilizing this approach. See *Scham v. Dist. Cts. Trying Crim. Cases*, 148 F.3d 554, 558 (5th Cir. 1998) (abrogated on other grounds) (utilizing the State Bar of Texas Attorney Billing & Compensation Survey Hourly Rate Report to determine the prevailing hourly rate of attorneys for the state of Texas).[40]

### a. Calculating the Lodestar Amount

#### 1.  Prevailing Hourly Rate in the Community for Similar Work

In this bankruptcy case, while the UST argues that the prevailing hourly rate, according to its reference to other current Chapter 11 bankruptcy cases, is in the range of $425.00 to $450.00, the Court feels obligated to highlight the fact that the UST routinely objects to any hourly rate above $450.00, which may well provide an explanation as to why the hourly rates it has cited seldom exceed that amount. But as the Applicants have shown, bankruptcy courts in Mississippi have approved hourly fees that are commensurate with the hourly rates urged by the Applicants here.[41] In addition, both Applicants have shown that the fixed hourly rates requested in this case of $650.00 for Johnson (Jones Walker) and $640.00 and $940.00 for Guon and Fishman (Cozen) are lower than their firms' standard rates for 2023.

Further, the Court finds instructive the indexes submitted by the Applicants which show that the hourly rate allowed in *Sanderson Plumbing*, adjusted for inflation, and considering an overall increase in legal costs over eight years, to be in the range of $567.00 to $604.00. As illustrated in the Attorney Declaration table on page 12, multiple firms and attorneys that practice

---

[40] The Court notes that many of the cases cited by the Applicants and the UST to support their respective positions on the reasonableness of hourly rates are cases from the Southern District of Mississippi.

[41] See *Joint Submission,* ¶ 32, Chart 2. Dkt. #169.

in Mississippi charge hourly rates that exceed $450.00. In fact, the average hourly rate of the firms who submitted declarations on behalf of the applicants is approximately $550.00 for partners and $360.00 for associates. In addition, Cozen is an out of district firm, which may very well want to request approval of hourly rates charged in their home district.[42] While no evidence suggests that Feilitech would not have been able to obtain lead counsel from Mississippi, the Court agrees with Geno in that debtors should be able to choose their own representation. Fee awards must still, however, be reasonable. Accordingly, based on the testimony, exhibits, and the Court's knowledge and experience in this bankruptcy case, the Court concludes that the appropriate prevailing rates in this community would be in the range of $550.00 to $600.00 per hour for partners or counsel and $350.00 to $400.00 per hour for associates.[43]

### 2.   Reasonable Hours Expended

The Court previously discussed the number of hours billed for services rendered and defers to its discussion above as the analysis would be the same. Having determined the prevailing market rate range in the community and the number of hours reasonably expended, the Court would multiply the number of reasonable hours by the hourly rate(s). Therefore, if the Applicants were to be compensated under a § 330 analysis, on the lower end of the prevailing hourly rate range, the lodestar amount would be $27,495.00 for Jones Walker. That amount consists of Johnson's 33.3 hours at $550.00 per hour and Brabston's 34 hours at $270.00 per hour. The higher end would total $30,860.00 at a $600.00 hourly rate for Johnson and a $320.00 hourly rate for Brabston. For

---

[42] Of course, while out of state law firms may want to charge their normal hourly rates, the hourly rates must be reasonable, and Court will not always approve those hourly rates depending on the circumstances.

[43] While no party presented sufficient evidence regarding the prevailing hourly rate for paraprofessionals, based on the Court's knowledge and experience and considering the facts in this bankruptcy case, that amount would be in the range of $270.00 to $320.00.

Cozen, on the lower end of the prevailing hourly rate range, the lodestar amount would be $93,114.00. That amount consists of Guon's 131.7 hours at $550.00 and 23.2 hours at $225.00 (half-rate travel time), Fishman's 1.4 hours at $550.00, Eisenberg's 3.4 hours at $550.00, Sanfelippo's 6.9 hours at $350.00, and Fredericks's 37.7 hours at $270.00. The higher end would total $103,684.00 at a $600 hourly rate for Guon, Fishman and Eisenberg, a $400.00 hourly rate for Sanfelippo, and a $320.00 hourly rate for Frederick.

### b.  Adjustments to the Lodestar

Having determined the appropriate lodestar amount, the Court would then decide whether the application of the § 330 factors and the *Johnson* factors warrant upward or downward adjustment. As the first, second, and last § 330 factors (labeled as (A), (B), and (F) in the Bankruptcy Code) were previously discussed when determining the lodestar amount, they will not be discussed below. The Court will discuss the third, fourth, and fifth factors, labeled as (C), (D), and (E) in the Bankruptcy Code.

> (C) Whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of a case under this title

As discussed in above, the Court finds that the services of both Jones Walker and Cozen were necessary and reasonable.

> (D) Whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed

All professional services performed by both firms have been performed in a reasonable amount of time given the amount of investigation and research required.

> (E) With respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field

Multiple members of both Cozen and Jones Walker are board certified, are members of multiple nationally recognized bankruptcy organizations, and have for multiple years concentrated their practice within the area of bankruptcy.

Moving along, the Johnson factors overlap with the § 330 factors and the method for calculating the lodestar. The Court previously discussed the first and fifth *Johnson* factors in calculating the lodestar and the second, third, sixth, eighth, ninth, and twelfth *Johnson* factors under § 330. Therefore, the Court would defer to its treatment of those factors in the prior discussion. The remaining *Johnson* factors (the fourth, seventh, tenth, and eleventh factors) are discussed below.

4.  The preclusion from other employment

As to this factor, there is no evidence in the record, aside from the number of hours billed, as to how many bankruptcy cases either law firm may have had to turn down to perform the necessary work in this case.

7.  Time limitations imposed by the client or other circumstances

Based on facts in the record and statements within the Interim Fee Applications, the Court would consider that the sale of most of the Debtor's assets became necessary in a more expedited fashion when the Debtor's primary customer ceased its relationship with the Debtor at some point after the Petition Date. Therefore, these circumstances could have posed heightened time constraints on the Applicants.

10. The undesirability of the case

No facts within the record indicate that this bankruptcy case was particularly undesirable.

11. The nature and length of the professional relationship with the client.

There are no facts in the record to indicate that Jones Walker has any previous relationship

with Feilitech. On the other hand, based on arguments presented at the Initial and Second Hearings

and Cozen's Employment Application, the Court is aware that Feilitech's sole owner had

connections with Cozen and chose it to represent Feilitech based on prior knowledge of Cozen's

work.

3.  *Summary*

After consideration of the above factors, the Court would likely not deviate from the

lodestar amount because, in this instance, the Court would have the ability of hindsight. From the

Court's perspective, this bankruptcy case is not as complex and demanding as all parties likely

expected.[44] Under different circumstances, the Applicants could very well have recovered their

normal hourly rates under § 330 at the compensation application stage. In any event, this Court

does not imply in this illustrative analysis that the above hourly rates be used as a cap on attorneys'

fees. As the Court feels required to point out, the decision in *Sanderson Plumbing* was intended to

determine the prevailing market rate at the time and the reasonable hourly rate for that case only.

The appropriate application of § 330 would require an individual determination of reasonableness

in each case.

As illustrated above, the hourly rates requested by the applicants potentially could have

been reduced if not employed under § 328. Because the applicants did receive prior approval of

their hourly rates under § 328, and the standard for reducing those hourly rates has not been met,

their hourly fees will not be reduced. In deciding this issue, the Court also does not intend to

suggest that practitioners are able or will be able to circumvent the relevant sections of the

---

[44] As to expenses under a § 330 analysis, the Court would defer to its prior discussion on
expenses and award the full expense reimbursement requested by the Applicants.

Bankruptcy Code and simply shoot for the moon when requesting compensation. This outcome simply reflects the reality of §§ 327 through 330, which is that when professionals are not employed under § 328, the Court may use hindsight when assessing the reasonableness of a professional's compensation—a tool not available when hourly rates are preapproved under § 328.

## IV. CONCLUSION

Considering all facts and arguments presented to the Court at the Initial and Second Hearings, in the parties' pleadings, and for the reasons stated above, the Court finds that the Applicants' fee arrangements were approved under § 328 and that no terms in those arrangements have proven to be improvident considering developments not capable of being anticipated. The Court also hopes that its illustrative § 330 analysis will better assist the parties in the future when seeking compensation under § 330 rather than § 328. Further, the Court expects practitioners who appear before it to adequately address justifications for hourly rates in any applications and objections to hourly rates in responsive pleadings under the requisite burdens, utilizing the facts and circumstances as they exist on a case-by-case basis. Based on the above, it is therefore,

**ORDERED** that:

1. The *First Interim Application for Compensation and Reimbursement of Expenses for the Period of February 28, 2023, through May 31, 2023, by the Law Firm of Jones Walker LLP as Counsel to Debtor* (Dkt. #129) is **APPROVED IN PART** and **DISAPPROVED IN PART**. Jones Walker is awarded a total of $33,012.14 in interim compensation, representing $30,825.00 in attorney's fees and $2,187.14 in expenses. Jones Walker shall first be compensated from the existing balance of their prepetition retainer before utilizing any other bankruptcy estate funds;

2.  The *First Interim Application for Compensation and Reimbursement of Expenses for the Period of February 28, 2023, through May 31, 2023, by the Law Firm of Cozen O'Connor as Counsel to the Debtor* (Dkt. #133) is **APPROVED IN PART** and **DISAPPROVED IN PART**. Cozen is awarded a total of $113,172.23 in interim compensation, representing $109,437.50 in attorney's fees and $3,734.73 in expenses. Cozen shall first be compensated from the existing balance of their prepetition retainer before utilizing any other bankruptcy estate funds;

3.  To the extent the UST Response is considered an objection, the *UST Response to First Interim Application for Compensation for Jones Walker LLP [Dkt. 129]* (Dkt. #147) is **OVERRULED**; and

4.  To the extent the UST Response is considered an objection, the *UST Response to First Interim Application for Compensation for Cozen O'Connor [Dkt. 133]* (Dkt. #148) is **OVERRULED**.

##END OF ORDER##